# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 0 1 C 50431 | **DATE** | 7/30/2002 |
| **CASE TITLE** | HOLLE vs. BARNHART | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Pursuant to the attached Memorandum Opinion and Order, Plaintiff's Motion for Summary Judgment is hereby denied. Defendant's Motion for Summary Judgment is granted. Enter attached Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required, advised in open court. | | | number of notices | |
| | No notices required. | | | | |
| ✓ | Notices mailed by judge's staff. | | | JUL 3 1 2002 | |
| | Notified counsel by telephone. | | | date docketed | |
| | Docketing to mail notices. | | | | |
| | Mail AO 450 form. | | CLERK U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | 7/30/2002 | |
| tml | | courtroom deputy's initials | 02 JUL 30 PM 2: 50 | date mailed notice | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

GARY HOLLE,      )
                 )
   **Plaintiff,**      )
                 )
       v.      )
                 )
JO ANNE B. BARNHART,      )
COMMISSIONER OF SOCIAL      )
SECURITY,      )
                 )
   **Defendant.**      )

Case No. 0[1] C 50431

Magistrate Judge
P. Michael Mahoney

## MEMORANDUM OPINION AND ORDER

Plaintiff, (Plaintiff), seeks judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner). See 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Supplemental Security Income (SSI) pursuant to Title XVI of the Social Security Act (the Act). 42 U.S.C. §§ 1381(a) and 1382(c). This matter is before the Magistrate Judge pursuant to consents filed by both parties on. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.    BACKGROUND

Plaintiff filed for DIB on September 10, 1999, alleging disability beginning on February 15, 1992. (Tr. 130-132). Plaintiff's application for benefits was denied on December 20, 1999. (Tr. 95-98). On January 10, 2000, Plaintiff filed a request for reconsideration. (Tr. 102-104). Plaintiff's request for reconsideration was denied on February 1, 2000. (Tr. 105-107). Plaintiff then filed a request for a hearing before an Administrative Law Judge (ALJ) on February 18, 2000. (Tr. 108-110). Plaintiff appeared, with counsel, before an ALJ on June 1, 2000. (Tr. 23-79). In a decision

dated August 24, 2000, the ALJ found that Plaintiff was not entitled to SSI. (Tr. 8-22). On October 24, 2000, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 7). On September 28, 2001, the Appeals Council denied Plaintiff's request for review. (Tr. 5-6).

## II.    HEARING TESTIMONY

Plaintiff was thirty-five years old at the time of the hearing, lived with his mother and thirty-three year old sister, who has Down's Syndrome, in Lee, Illinois, and had obtained a high school diploma. (Tr. 31, 54). Plaintiff began experiencing headaches in February 1992, began experiencing back problems in 1995, and complains of a burning sensation since January 1998. (Tr. 32-33). Plaintiff testified that the last work he did was prior to 1992 and that he worked mowing lawns and would work thirty-five or more hours a week and earn almost $1,000 a month. (Tr. 34-35). Prior to mowing lawns, Plaintiff worked at Del Monte doing seasonal assembly line work that involved standing all day but no lifting. (Tr. 36-37). Plaintiff also worked at a race horse farm as a laborer, cleaning stalls and lifting bales of hay weighing fifty pounds. (Tr. 37). Plaintiff testified that prior to that he had worked at a hog farm as a laborer and was required to be on his feet all day and perform heavy lifting. (Tr. 38). Plaintiff's earliest work, in 1983 and 1984, was as a janitor in a meat plant. (Tr. 38).

Plaintiff testified that since he stopped working, and has suffered from the burning sensations he spends most of the day lying down in the dark with ice packs and takes four or five cold baths each day. (Tr. 38-39). Plaintiff stated that he does not do much else other than occasionally watch TV in the evenings and that he rarely feels up to helping his mother and sister with household tasks. (Tr. 40). Plaintiff occasionally accompanies his mother to the grocery store but stated that he has constant headaches that vary in severity. (Tr. 40-41). Plaintiff testified that he has very severe

2

headaches about 75 percent of the time and that he then lays down in a dark room with an ice pack over his eyes and neck and that he then cannot do anything. (Tr. 41-42). Plaintiff could not specify anything specifically that causes his headaches and stated that they never go away, but that bright light does aggravate them. (Tr. 57). Also, Plaintiff experiences nausea as a result of the headaches several days a week and is often weak and tired. (Tr. 58). Plaintiff testified that the only time he has had any relief from the headaches was when he went to the emergency room and was given a shot of Demerol. (Tr. 58-59). Currently, Plaintiff is taking Motrin, aspirin, and over-the-counter anti-nausea medication. (Tr. 59). Plaintiff stated that he also has blood pressure problems, leg weakness and spasms, and lower back pain. (Tr. 42-43). Plaintiff takes a muscle relaxant for his leg spasms which he experiences down both legs and wears a back brace for the pain and stiffness he experiences in his lower back. (Tr. 42-43). Plaintiff stated that he also is depressed and irritable as a result of his physical condition and that he had been on Prozac for a while in 1999. (Tr. 44-45). Plaintiff testified that he had been in treatment at the Diamond Headache Clinic in Chicago, Illinois, for ten months in 1996. (Tr. 46). Plaintiff was also treated by a neurologist and a rheumatologist and had been treated at Medical Pain Management in Rockford, Illinois, for his headaches. (Tr. 47-48). Plaintiff testified that he had been on Ultram but that he weaned himself off the medication after becoming addicted. (Tr. 49). Plaintiff has been unable to pay for his medical treatment and has relied on his mother, who does not work and receives Social Security, to assist him in paying for treatment. (Tr. 51). Plaintiff states that he has not looked for work since 1992 as he has been unable to do anything. (Tr. 52). Plaintiff stated that he drove to the hearing but that, otherwise, he rarely drives except occasional trips to the grocery store and his appointments with his doctors. (Tr. 52-53). Prior to his illness, Plaintiff stated that he would play basketball, golf, and fish, and that currently

he only leaves the house once every few weeks and spends about three hours each day watching TV. (Tr. 54, 61). Plaintiff testified that when he does leave the house, he can not walk for more than thirty to forty minutes due to his back and leg pain. (Tr. 56). Plaintiff has not seen his friends for a couple of years and stated that he doesn't feel like visiting with anyone. (Tr. 60-61). Plaintiff stated that he is not able to stand when he has a severe headache, but otherwise can stand for about an hour. He can sit for about forty-five minutes before his back becomes irritated, but he cannot lift heavy objects without aggravating his back. (Tr. 61-63).

A vocational expert, Mr. Christopher Yep, was called upon to testify at Plaintiff's hearing. (Tr. 63-78). Mr. Yep testified that Plaintiff had previously worked at two farm-hand positions, on an assembly line at Del Monte, and as a lawn mower. (Tr. 64-64). Mr. Yep classified those positions as unskilled, medium exertion work, except the assembly line job, which was light exertion. (Tr. 65-66). The ALJ then proposed the following hypothetical individual to Mr. Yep: a male individual; thirty-five years old; with a high school education who can read; write and use numbers; has the same work history as Plaintiff; can lift and carry fifty pounds occasionally; can lift and carry twenty-five pounds frequently; can sit, stand, or walk for six hours, with normal breaks, in an eight hour work day; and can not climb, kneel, balance, stoop, crawl, or kneel more than frequently. (Tr. 67). Mr. Yep stated that such an individual would be able to perform Plaintiff's past relevant work as long as those positions remained at the medium exertion level. (Tr. 67). The ALJ then added that the individual also cannot be exposed to extreme heat, cannot remember or carry out complex or detailed tasks, but can remember and carry out simple tasks, and cannot perform work which requires more than occasional close or direct dealings with the general public. (Tr. 68). Mr. Yep testified that an individual with those additional limitations would not be able to perform as a farm hand due to

4

the heat exposure, but can still work at Del Monte. (Tr. 68). The ALJ then indicated that the Del Monte job was seasonal. (Tr. 68). The ALJ asked Mr. Yep what effect would be had if the individual were not able to perform work requiring exposure to direct light sources, but is able to work in a situation with overhead lighting and Mr. Yep responded that the individual would still be able to perform the work at Del Monte. (Tr. 68-69). The ALJ then inquired as to the Illinois economy and the availability of jobs for an individual with the limitations described in the preceding hypothetical who can perform light and sedentary work. (Tr. 70). Mr. Yep testified that such an individual can be employed as a hand packager or inspector. (Tr. 70). Mr. Yep noted that 44,743 hand packaging positions at the light level exist and that 22,457 inspecting jobs exist, sixty percent of which are at the light level and forty percent at the sedentary level. (Tr. 70-71). Mr. Yep also reported that the individual would be able to work in an assembly position and that 65,494 assembly jobs exist with sixty percent at the light level and forty percent at the sedentary level. (Tr. 71). The ALJ then proposed that the individual was limited in that he could stand and walk for a combined total of only two hours a day and Mr. Yep stated that such a limitation would result in the light positions being eliminated in all areas previously mentioned but would not change the ability of the individual to perform the sedentary positions. (Tr. 71). Mr. Yep noted that for unskilled work, one day each month of missed attendance is tolerable but any more than that would foreclose gainful employment. (Tr. 72). Plaintiff's attorney then questioned Mr. Yep with regard to the breaks permissible in the above mentioned positions. (Tr. 73). Mr. Yep testified that an individual in those positions would not be able to take rest breaks in addition to the scheduled breaks provided. (Tr. 73). The ALJ then asked Mr. Yep whether there would be an impact on the available jobs from the individual's wearing dark glasses during the work day and Mr. Yep responded that there may be a

problem with the inspecting positions, but that a normal photo gray lens would not have an effect on the availability of the positions. (Tr. 74). As to the noise levels at the identified positions, Mr. Yep testified that most of the positions are at level three and some are at level two. (Tr. 77). Mr. Yep noted that level three noise is equivalent to a moderate business office where typewriters are used, a grocery or department store, light traffic, or a fast food restaurant off hours. (Tr. 78). Mr. Yep stated that some might be louder if there is a stamping machine, for example. (Tr. 77). Finally, Mr. Yep testified that an individual that had headaches requiring them to be in a darkened room for seven hours each day would be unemployable. (Tr. 78).

### III.   **MEDICAL HISTORY**

Plaintiff was seen by Dr. Terry Roth, MD, a neurologist, on January 19, 1993, for evaluation of left sided neck and head pain. (Tr. 189). Plaintiff denied any nausea but reported that the Compazine had helped with his pain. (Tr. 189). Dr. Roth noted brisk reflexes and recommended that cervical x-rays be taken to rule out cervical involvement. (Tr. 189). Cervical x-rays taken January 19, 1993, were negative. (Tr. 190). On February 16, 1993, Dr. Roth indicated that Plaintiff still complained of pain and reported that he had been sleeping twelve hours a day. (Tr. 188). Plaintiff was seen by Dr. Osmani at Rochelle Community Hospital on March 16, 1993, for headaches and neck pain. (Tr. 186). Plaintiff reported headaches every day that had not responded to Midrin. (Tr. 186). Dr. Osmani indicated that he had ordered a CT scan that was negative and prescribed Elavil. (Tr. 186).

On December 13, 1994, Plaintiff went to the emergency room at Rochelle Community Hospital with complaints of a bilateral headache. (Tr. 182). Plaintiff reported a three year history of headaches that was worse on that day and had no nausea or photophobia. (Tr. 182). A shot of

6

Demerol was administered. (Tr. 182). Plaintiff was seen by Dr. Roth at Rochelle Community Hospital on December 20, 1994, for a follow-up of his headaches, joint pain, and fatigue. (Tr. 181). Dr. Roth noted that Plaintiff had not responded to any migraine medication, had mixed results with a shot of Demerol, he was grossly intact neurologically, and a CT scan done the previous year of the brain was negative. (Tr. 181). Dr. Roth referred Plaintiff to a rheumatologist to address his complaints of joint pain and fatigue. (Tr. 181). In his notes, Dr. Roth noted that Plaintiff reported that he had little problem with his headaches and that his main complaint was stiffness in his neck. (Tr. 185). Plaintiff reported that he had obtained some relief from Xanax, but denied any depression. (Tr. 185). Dr. Roth indicated that Plaintiff's vague, persistent complaints seem more psychological. (Tr. 185).

Treatment notes from Medical Pain Management Services in Loves Park, Illinois, indicated that Plaintiff was seen for headaches and multiple somatic complaints. (Tr. 194). Plaintiff was treated by Dr. Julian Chestnut, DO. (Tr. 195). Dr. Chestnut indicated that Plaintiff reported a three year history of headaches that had not responded to medication. (Tr. 200). Dr. Chestnut reported that Plaintiff appeared to be in some discomfort, was well groomed, and was oriented to time, place, and person. (Tr. 200). On May 24, 1995, Plaintiff reported that the acupuncture treatments had not yet provided any relief. (Tr. 199). Plaintiff was seen on June 7, 1995, and reported that he was currently suffering from a headache. (Tr. 198). Dr. Chestnut reported that Plaintiff was neurologically intact, noted no trigger points, and gave Plaintiff a sample of Ultram to try. (Tr. 198). On June 13, 1995, Plaintiff reported that the Ultram helped take the edge off his pain and stated that he was experiencing some low back pain. (Tr. 197). Plaintiff was seen on June 20, 1995, for a follow-up appointment and complained of leg and knee pain in addition to his headaches which had improved

in intensity on the Ultram but were still occurring daily. (Tr. 196). On June 28, 1995, Dr. Chestnut referred Plaintiff for acupuncture treatment and recommended that he see an ENT for his sinus complaints. (Tr. 195). On July 3, 1995, Plaintiff reported that acupuncture had not helped him at all but that he did benefit from taking Ultram. (Tr. 194).

Plaintiff was also treated by his family physician, Dr. Edward Johnson, MD, for his headaches. (Tr. 205-207). In a letter dated January 20, 1995, Dr. Johnson reported that he had treated Plaintiff for a long period of time and that Plaintiff's main complaint was chronic headaches and generalized weakness. (Tr. 207). Dr. Johnson noted that Plaintiff had been treated by several physicians with no sustained relief from his headaches and probably has an associated chronic fatigue syndrome. (Tr. 207). In a survey to the Bureau of Disability Determination Services dated September 27, 1999, Dr. Johnson reported that Plaintiff has been a patient since 1995 and was last seen on September 27, 1999. (Tr. 205). Dr. Johnson indicated that Plaintiff suffers from chronic low back pain, chronic headaches, and sciatic neuritis, on the right side. (Tr. 205-206). Plaintiff has normal reflexes, walks unassisted, and has some evidence of nerve root compression. (Tr. 206). In response to a question regarding Plaintiff's ability to work, Dr. Johnson reported that Plaintiff cannot perform tasks requiring lifting and carrying more than twenty pounds and that standing bothers his spine. (Tr. 206).

Dr. Stanley Brandon, MD, an orthopedic specialist, saw Plaintiff on March 26, 1997, and reported that Plaintiff had slight degenerative changes at L1-2 with some anterior spurring. (Tr. 212). Dr. Brandon indicated that Plaintiff complained of back pain and that he could probably be treated with aspirin. (Tr. 212).

Treatment records from Dr. Joseph Pittman, MD, indicate that Plaintiff complained of sinus

8

congestion, heat sensations, and headaches (Tr. 240-256). Plaintiff was seen by Dr. Pittman on January 29, 1999, for his complaints of heat intolerance. (Tr. 240). Dr. Pittman noted that Plaintiff reported headaches beginning six years ago and that he had tried numerous medications and seen several doctors with no relief. (Tr. 240). Plaintiff reported that he had been on several migraine medications and that Ultram is the only medication that worked and he had to stop using it when he became addicted. (Tr. 240). Plaintiff reported feeling shaky, hot, and sweating profusely. (Tr. 240). Dr. Pittman noted that Plaintiff was overweight, depressed, and agitated. (Tr. 240). At Plaintiff's request, Dr. Pittman gave Plaintiff a prescription for Prozac. (Tr. 241). No abnormalities were noted on physical examination. (Tr. 241).

Plaintiff was seen by Dr. Fred Nathan, MD, an orthopedic specialist, on March 12, 1999. (Tr. 265). Plaintiff had been referred to Dr. Nathan by his treating physician, Dr. Johnson. (Tr. 265). Dr. Nathan indicated that Plaintiff complained of low back, knee, and hip pain. (Tr. 265). Dr. Nathan reported "His [Plaintiff's] clinical examination was essentially unremarkable and I would be very surprised if he has any pathologic problems. Nevertheless he is quite incapacitated and if the entire workup is negative, he may be a good candidate to refer to counseling and perhaps psychological evaluation." (Tr. 265).

Plaintiff was examined by Dr. Kishore Thampy, MD, a psychiatrist, through the Bureau of Disability Determination Services on November 30, 1999. (Tr. 213). Dr. Thampy reported that Plaintiff appeared cooperative and fairly reliable and that he stated he is unable to work due to headaches and backaches. (Tr. 213). Plaintiff reported that he almost never leaves the house, he lies on the couch with ice packs on his head, and that he has experienced shooting pains in his head, with no relief since 1992, and back pain since 1994. (Tr. 213). Plaintiff reported that he had no history

of psychiatric illness or treatment but that he does feel depressed due to his constant pain. (Tr. 213). Plaintiff's headaches are, reportedly, worse in the morning and he suffers from no disturbance of sleep but usually wakes up with a headache. (Tr. 213). Plaintiff has occasional thoughts of suicide but has no plan or intention, has an adequate appetite and his weight has remained stable, feels frustrated but not hopeless, and denies crying spells or psychotic symptoms. (Tr. 213). Plaintiff reported that he awakes at 9:00 each morning, applies ice packs, stays in a darkened room, avoids social activities, has no hobbies, and goes out only occasionally for groceries with his mother. (Tr. 214). Dr. Thampy stated that Plaintiff was moderately overweight, casually dressed, and not in any acute physical distress. (Tr. 214). Plaintiff's eye contact was fair, he kept his eyes partially shut, his affect was appropriate, and there was no mood lability. (Tr. 214). Plaintiff's psychomotor activity, gait, and posture were not impaired. (Tr. 214). Dr. Thampy concluded that Plaintiff did not appear to suffer from a serious psychiatric illness. (Tr. 215). However, Dr. Thampy noted that there was significant dysfunction present but stated "that in the absence of any objective medical information relating to the severity of his pain, it is difficult to establish any issues related to this condition." (Tr. 215).

On October 13, 1999, Dr. Henry S. Bernet, MD, completed a Residual Functional Capacity (RFC) assessment as to Plaintiff. (Tr. 217-224). Dr. Bernet found that Plaintiff is capable of lifting fifty pounds occasionally and twenty-five pounds frequently and standing, walking, or sitting for six hours in an eight hour work day. (Tr. 218). Dr. Bernet found that Plaintiff did not have any postural, manipulative, visual, communicative or environmental limitations. (Tr. 219-221).

A Psychiatric Review Technique Form (PRTF), completed December 12, 1999, by Dr. Tyrone C. Hollerauer, Psy D, indicated that Plaintiff suffers from no medically determinable

10

psychological impairment. (Tr. 225-233). Dr. Hollerauer noted on the front page of the form that Plaintiff is unhappy due to his alleged chronic pain. (Tr. 225). The form is otherwise blank. (Tr. 225-233).

On March 17, 2000, Plaintiff's treating physician, Dr. Edward Johnson, MD, completed a Report of Incapacity form for the Illinois Department of Human Services. (Tr. 252-256). Dr. Johnson indicated that Plaintiff suffers from chronic migraine headaches, chronic fatigue syndrome, and variable joint pain (cause not determined). (Tr. 252). In completing the form, Dr. Johnson indicated that Plaintiff has the full capacity for most sustained physical activity and noted reduced capacity (up to twenty percent reduced) in regard to Plaintiff's ability to bend, turn, and stoop. (Tr. 255). Dr. Johnson noted that Plaintiff is ten to twenty percent reduced in his capacity with respect to social functioning and concentration, persistence, and pace and that Plaintiff is more than fifty percent reduced in his capacity to perform activities of daily living. (Tr. 255). Dr. Johnson concluded that Plaintiff is totally disabled because of chronic headaches. (Tr. 255).

## IV.    **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the

Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th Cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F. Supp. 1377, 1384 (N.D. Ill. 1995).

## V. FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in

any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[1] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

---

[1]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[2] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education, and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any

---

[2]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1565; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala,* 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    **ANALYSIS**

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on September 22, 1998. (Tr.

17).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffers from headaches, degenerative disc disease and depression. (Tr. 17).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.      Step Three: Does claimant's impairment meet or medically equivalent to an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations Number 4. (Tr. 89). Plaintiff does assert that he has a medically determinable impairment that meets Listing 12.07 and 12.08. (Plaintiff's Memorandum at 4, filed 3/19/2002). Plaintiff asserts that he meets Listing 12.08 regarding somatoform disorders. Plaintiff notes that he has sought and received extensive medical

treatment for his headaches and that his condition has worsened in spite of the treatment and a lack of objective medical evidence to support his complaints of chronic and severe pain. The lack of evidence of a physical origin for Plaintiff's pain then, implies a psychological cause. At the hearing, Plaintiff's attorney suggested the existence of a somatoform disorder to the ALJ and requested a psychological evaluation. That request was denied. The ALJ indicated that Plaintiff had received a psychological examination in 1999 and that the record contains treating source notes through March 2000. (Tr. 15) In light of the evidence already included in the record, the ALJ determined that further evaluation was unwarranted. (Tr. 15).

The record contains little evidence that Plaintiff suffers from a psychological impairment, particularly an impairment that rises to the level of severity required by the Listings. As noted by Plaintiff in his brief, there are several incidental references in Plaintiff's treatment notes that may indicate that Plaintiff does have psychological issues and Plaintiff has consistently been prescribed anti-depressant medication. (Plaintiff's Memorandum at 5, filed 3/19/2002). However, Plaintiff did receive a consultative psychological exam. (Tr. 213-215). Plaintiff was evaluated by Dr. Kishore Thampy, MD, a psychiatrist, on November 30, 1999. (Tr. 213). Dr. Thampy took a medical and psychological history from Plaintiff, reviewed his daily activities, and conducted a mental status exam. (Tr. 213-215). Dr. Thampy concluded that Plaintiff does not currently suffer from a serious psychiatric illness. (Tr. 215). Dr. Thampy stated "In the absence of any objective medical information relating to the severity of his pain, it is difficult to establish any issues related to this condition. However, it does appear that even prior to his injury, he was not functioning at a level commensurate with his capabilities and potential." (Tr. 215). The ALJ noted that Plaintiff has never been diagnosed with a mental impairment and no mental symptomatology has been noted in his

treatment notes. (Tr. 15). This court finds that substantial evidence exists to support the ALJ's finding regarding the absence of mental impairment. With very little evidence Plaintiff seeks an inference of mental illness based upon a lack of evidence to support his physical impairment. Plaintiff has not met his burden at this Step of the analysis. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.     Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform his past relevant work. (Tr. 17). The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed.

E.     Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At this step of the analysis, the ALJ determined that Plaintiff retains the RFC to lift and carry twenty pounds occasionally and ten pounds frequently; stand, sit, or walk for six hours each in an eight hour work day; climb, balance, stoop, bend, crouch, crawl, and kneel occasionally; he cannot perform work that requires exposure to direct light sources, but can work in conditions with overhead lighting; cannot work in extremes of heat; cannot remember and carry out detailed instructions or tasks; and can interact with the general public only occasionally. (Tr. 17). This determination is supported by the record.

Objective medical evidence indicates that Plaintiff has some mild degenerative disc disease at L1-2. (Tr. 212). Plaintiff's treating physician, Dr. Johnson, indicated that Plaintiff has full

18

capacity for walking, standing, and sitting, and has a twenty percent reduction in his capacity for bending, stooping, turning, and lifting. (Tr. 255). While Dr. Johnson indicated that Plaintiff is totally disabled due to headaches, he described Plaintiff's mental functioning as normal. (Tr. 255). The ALJ found that Plaintiff's allegations of limited daily activities were not supported by objective medical evidence. Plaintiff's medical history consists of routine medical treatment. Plaintiff is currently taking only aspirin and Motrin for his headaches. The ALJ found that Plaintiff's complaints of debilitating headaches are not supported by evidence of frequency or severity, evidence of objective pathology, or evidence of serious intervention such as emergency room visits. (Tr. 14). While it is natural and appropriate for a treating physician to assume that a patient's complaints of pain are accurate, more is required of Plaintiff to support a claim for disability benefits. Social Security regulations regarding Plaintiff's allegations of disabling symptoms and pain provide,

> However, statements about your pain or other symptoms will not alone establish that you are disabled; there must be medical signs and laboratory findings which show that you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and which, when considered with all of the other evidence (including statements about the intensity and persistence of your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled. 20 CFR § 404.1529(a)

The ALJ found that Plaintiff's complaints of debilitating headaches are not supported by evidence of frequency or severity, evidence of objective pathology, or evidence of serious intervention such as emergency room visits. (Tr. 14). These determinations are supported by the record. Plaintiff's medical records do not indicate any objective medical evidence supporting Plaintiff's complaints of disabling pain. This court also notes that the treatment notes submitted by Dr. Johnson were illegible. This court attempted, mostly unsuccessfully, to decipher the notes and was unable to make out any diagnosis or find any evidence supporting Plaintiff's allegations. Dr. Johnson's opinion that Plaintiff is totally disabled is therefore unsubstantiated as it is not otherwise supported by objective

medical evidence.

After determining Plaintiff's RFC, the ALJ determined, based upon the testimony of the vocational expert and using Medical-Vocational Rule 202.20, that Plaintiff can perform a significant number of jobs. (Tr. 18). The ALJ determined that Plaintiff, at 36 years old, is categorized as a younger individual, has completed the twelfth grade in school, and has past work that is unskilled. (Tr. 17). The vocational expert, Mr. Yep, testified that an individual with the RFC determined by the ALJ would be able to work as a hand packager, an inspector, or in assembly. Mr. Yep stated that 44,743 hand packaging positions at the light level exist, 22,457 inspecting jobs exist, and 65,494 assembly jobs exist. (Tr. 70).

This court finds that substantial evidence exists to support the ALJ's findings at Step Five. Therefore, the ALJ's determination as to Step Five of the Analysis is affirmed.

## VII. CONCLUSION

In accordance with the above, the ALJ is affirmed at each step of the sequential evaluation. Plaintiff's motion for summary judgment is hereby denied. Defendant's motion is granted.

ENTER:

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 7/30/02

# United States District Court
## Northern District of Illinois
### Western Division

GARY HOLLE

v.

JO ANNE BARNHART

**JUDGMENT IN A CIVIL CASE**

Case Number: 01 C 50431

☐     Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■     Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that plaintiff's motion for summary judgment is denied. Defendant's motion for summary judgment is granted. Judgment is entered in favor of the defendant Jo Anne Barnhart and against the plaintiff Gary Holle.

FILED WD
02 JUL 30 PM 2:50
CLERK
U.S. DISTRICT COURT

Michael W. Dobbins, Clerk of Court

Date: 7/30/2002

Gale L. Graeff, Deputy Clerk